**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BARBARA J. LUEDERS**, individually and on behalf of a class of similarly situated persons, | No.  08-CV-2457 |
| Plaintiff, | Judge Wayne R. Andersen |
| v. | |
| **3M COMPANY,** | |
| Defendant. | |

**<u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO TRANSFER VENUE</u>**

## I.    INTRODUCTION

Pursuant to 28 U.S.C. § 1404(a), Defendant 3M Company ("3M") moves this Court to transfer the putative class action lawsuit filed by Plaintiff Barbara J. Lueders ("Plaintiff") to the United States District Court for the Central District of Illinois, located in Rock Island County, Rock Island, Illinois.  Transfer under Section 1404(a) is warranted based on the convenience of witnesses, the parties, and in the interests of justice.

Plaintiff, a former employee at 3M's manufacturing plant in Cordova, Illinois and a resident of Thomson, Illinois brought this action on behalf of herself and other employees of the Cordova plant.  On her own behalf, Plaintiff alleges that 3M violated the Fair Labor Standards Act, 29 U.S.C. 213(a)(1) ("FLSA").  (Compl. ¶ 61)  A copy of the Complaint is attached as Exhibit A.  Plaintiff also purports to represent a class of Cordova employees asserting violations of the Illinois Minimum Wage Law, 820 ILCS  § 105/12(a), ("IMWL") and the Illinois Wage Payment and Collection Act, 820 ILCS §115/14, ("IWPCA").  (Compl. ¶¶ 40, 51).[1]

Plaintiff's individual and putative class claims are necessarily focused on the work performed by these employees and their compensation at 3M's Cordova, Illinois plant.  Cordova is on the Illinois banks of the Mississippi River, just north of the Quad Cities.  Thus, Plaintiff's case has no connection to the Northern District of Illinois.  All relevant evidence concerning how, where, and why Plaintiff and the putative class performed their jobs will be found outside this district, and most of it will be located in the Central District.  Such evidence, either through witness testimony and/or documents, will be primarily focused at, and emanate from, 3M's facility in Cordova, Illinois.  Plaintiff and all of the putative class members she seeks to represent work and/or worked at the Cordova facility.  In addition, the overwhelming majority of current employees at 3M's Cordova facility live in the Quad Cities area, within or near the Central District of Illinois.[2]  Thus, the geographic location of the witnesses, documents and other evidence weighs in favor of transfer.  Further, Plaintiff seeks injunctive relief which, if granted, would be enforced in the Central District.  Therefore, the Central District: (1) is closer to the

---

[1]  3M removed this case from state court pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act ("CAFA"), and pursuant to 28 U.S.C. §1441, based on federal question jurisdiction. *See* 3M's Notice of Petition for Removal, ¶¶ 5-8 and 27-29 (Dkt. #1).

[2] As such, approximately a third of the putative class members are residents of the State of Iowa.  (Dec. of Todd Weber, ¶ 14).  Approximately 101 of 3M Cordova's hourly employees live in the Illinois counties surrounding Cordova, which are located in the Central District, while another 142 live in Southeast Iowa. *Id.*

relevant witnesses and evidence in this case; (2) is equally familiar with applicable Illinois and federal laws; and (3) has a greater local interest in the action. In addition, statistics published by the Administrative Office of the United States Courts show that the Central District presently has a significantly less crowded docket than that of the Northern District. For all these reasons and as discussed more fully below, the Court should grant 3M's motion and should transfer this action to the Central District of Illinois in Rock Island.

## II.    STATEMENT OF RELEVANT FACTS

3M is incorporated in the state of Delaware, with its corporate headquarters in St. Paul, Minnesota. (Declaration of Todd Weber, ¶ 2) A true and correct copy of the declaration of Todd Weber is attached as Exhibit B. 3M's Cordova facility is a material resource plant. *Id.* at ¶ 4. The Cordova facility makes a wide variety of specialty chemicals and adhesives. *Id.*. Ultimately, these products go into industrial, commercial, and consumer applications around the world for a broad range of customers. *Id.* As indicated above, Cordova is located overlooking the Mississippi River in Rock Island County, Illinois. *Id.* at ¶ 5. Rock Island County falls within the jurisdiction of the U.S. District Court for the Central District of Illinois.

Plaintiff seeks to represent a putative class of employees who, along with her, are all former or current employees of 3M's production facility in Cordova. (Compl. ¶ 29). Plaintiff alleges that she along with the putative class members were subject to unlawful employment practices and policies at 3M's Cordova facility. (Compl. ¶¶ 15-28). Specifically, Plaintiff alleges that 3M violated the Illinois Minimum Wage Law and the Illinois Wage Payment and Collection Act by failing to pay hourly, non-exempt employees for the time they were required to don and doff uniforms and other Personal Protective Equipment and report to their work stations 20 minutes prior to the start of their shifts. (Compl. ¶¶ 29, 43, 56). Plaintiff also alleges on behalf of herself individually that 3M violated the Fair Labor Standards Act by failing to pay Plaintiff minimum wage for all hours worked and overtime for the same. (Compl. ¶ 61).

Plaintiff was employed in 3M's Cordova facility as an hourly employee from January 29, 1990 to May 24, 2007. (Compl. ¶ 6). During the span of time Plaintiff was employed at Cordova, 3M employed approximately 426 hourly employees. (Dec. of Todd Weber, ¶ 13). Each employee is a potential witness to the issues raised in Plaintiff's Class Action Complaint. Most if not all of the current employees and many of the former employees including Plaintiff, reside in or near the Central District, many of them in or near Rock Island County, Illinois.

(Dec. of Todd Weber, ¶¶ 13-14).

Similarly, the vast majority of the significant documents and evidence, such as employee personnel files, payroll and timekeeping records, and documents that record the work performed by Plaintiff and the class she seeks to represent are housed at the Cordova plant. (Dec. of Todd Weber, ¶ 8).[3]  Indeed, the significant facts which form the basis for Plaintiff's Class Action Complaint occurred in the Central District of Illinois at 3M's Cordova facility, and the majority of the witnesses and relevant documents are all in the Central District as well.  *Id.* at ¶ 8.

## III.    STANDARD FOR § 1404(A) TRANSFER OF VENUE

Title 28 U.S.C. § 1404 provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a); s*ee also*, *Coleman v. Buchheit, Inc.*, 2004 WL 609369 at *1 (N.D. Ill. Mar. 22, 2004) (Guzman, J.) (transferring case to Central District of Illinois); *Pillar v. Exelon*, 2001 WL 766887, at *1 (N.D. Ill. July 6, 2001) (Darrah, J.) (same).  Congress enacted § 1404 as a "federal housekeeping measure, allowing easy change of venue within a unified federal system."  *Piper Aircraft v. Reyno*, 454 U.S. 235, 254 (1981).  Its purpose is "to prevent the waste of time, energy and money, and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  *Van Dusen v. Barrack*, 376 U.S. 612 (1964).  District courts have broad discretion to transfer a case to the forum in which judicial resources are most efficiently utilized and in which trial would be easiest, most expeditious and inexpensive.  *Response Reward Sys. v. Meijer, Inc.*, 189 F. Supp. 2d 1332, 1339-40 (M.D. Fla. 2002); *see also Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 655 (11th Cir. 1993) (holding that in an employment discrimination action, the court properly transferred venue to the location of the alleged harassment, the location of all employment records, and the residence of an overwhelming majority of witnesses).

## IV.    PLAINTIFF'S LAWSUIT SHOULD BE TRANSFERRED TO THE CENTRAL DISTRICT OF ILLINOIS

Courts apply a three-part test when evaluating a motion to transfer venue:  (1) venue is proper in the transferor district; (2) venue is proper in the transferee forum; and (3) the transfer is

---

[3]  To the extent some witnesses, documents or evidence are located at 3M headquarters, in St. Paul, Minnesota, the need to review or depose witnesses there is no greater burden if the case is venued in the Central District than if it is in the Northern District.

for the convenience of the parties and the witnesses and is in the interests of justice. *See Coleman* 2004 WL 609369 at \*1; *Pillar*, 2001 WL 766887, at \*1. Once it is apparent that the plaintiff could have filed the case in another district, a court's decision to transfer depends on the balance of convenience and justice. In making this determination, a judge has considerable discretion based on a "case-by-case consideration of convenience and fairness." *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

### A.    Venue Is Proper In The Transferor District.

Venue is proper in the transferor district pursuant to 28 U.S.C. § 1391(b). As in this case, wherein jurisdiction rests not on diversity but on the Class Action Fairness Act, 28 U.S.C. § 1332(d), and federal question jurisdiction, the action may, except as otherwise provided in the law, be brought only in (1) a judicial district where the defendant resides; (2) a judicial district where a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

For purposes of venue, a defendant that is a corporation is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. 28 U.S.C. § 1391(c). In a state which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate state. *Id.*; *see also* Notice Of Removal To Federal Court filed April 29, 2008 (Dkt. #1). Because 3M has sufficient contacts within the Northern District of Illinois, it "resides" there for personal jurisdiction purposes, and therefore, satisfies the first statutory element required for transfer of venue.

### B.    Venue Is Proper In The Transferee District.

Similarly, the second element of the transfer statute is satisfied as venue is also proper in the Central District of Illinois. A District Court is one in which the action could originally have been brought if: (1) it has subject matter jurisdiction; (2) defendant would have been subject to personal jurisdiction; and (3) venue would have been proper. *Hoffman v. Blaski*, 363 U.S. 335, 343-344. Venue in this case is governed by 28 U.S.C. sections 1391(b) and (c).

-4-

Here, Plaintiff could have initiated this action in Rock Island County or the U.S. District Court for the Central District of Illinois because 3M's Cordova, Illinois plant, the situs of the events giving rise to Plaintiff's claims, and the location of the material witnesses and evidence in this case, is located within both Rock Island County and the Central District. Accordingly, the Central District has subject matter jurisdiction over this lawsuit. Additionally, Plaintiff seeks to represent 3M employees in the Cordova facility. The majority of these 3M employees reside within or very close to the Central District. (Dec. of Todd Weber, ¶¶ 13-15). Accordingly, venue certainly is proper in the Central District of Illinois.

## V.   THE COURT SHOULD TRANSFER THIS CASE TO THE CENTRAL DISTRICT OF ILLINOIS FOR THE CONVENIENCE OF THE PARTIES AND WITNESSES AND IN THE INTEREST OF JUSTICE

The convenience of the parties and witnesses and the interests of justice require transfer of this case to the Central District of Illinois, thus satisfying the final element of the transfer statute. In evaluating the convenience and fairness of the proposed transfer under § 1404(a), the Court must consider both the private interests of the parties and the public interest of the Court. 28 U.S.C. § 1404(a); *Biomet v. Stryker Howmedica Osteonics Corp.*, 2004 WL 769358 at *3 (N.D. Ill. Apr. 9, 2004) (St. Eve, J.); *Doage v. Bd. of Regents*, 950 F. Supp. 258, 259 (N.D. Ill. 1997) (Norgle, J.). Private interests include: (1) the plaintiff's choice of forum; (2) the situs of the material events; (3) the availability of evidence in each forum; and (4) convenience to the parties. *Id.*; *see also*, *H.B. Sherman Mfg Co. v. Rain Bird Natl Sales Corp.*, 979 F. Supp. 627 (N.D. Ill. 1997) (Bucklo, J.). As set forth below, application of these principles to this case dictates a transfer to the Central District of Illinois.

### A.   The Convenience of the Parties Favors Transfer.

#### 1.   Plaintiff's Choice Of Chicago, Cook County, Illinois Should Be Given Little Deference.

Plaintiff's chosen forum of Chicago, Cook County, Illinois within the Northern District of Illinois, is accorded virtually no weight where the events giving rise to the cause of action "did not conclusively arise in the chosen forum." *Digital Merchant Sys., Inc. v. Ogelsby*, 1999 WL 1101769, at *6 (N.D. Ill. Nov. 30, 1999) (Williams, J.) (quoting *Countryman v. Stein Roe & Farnham*, 681 F. Supp. 479, 482-83 (N.D. Ill. 1983)); *see also Heller Fin., Inc.*, 713 F. Supp. at 1129; *Marvel Group v. Modular Interiors*, 2002 WL 1052043 at *5 (N.D. Ill. May 24, 2002)

(Norgle, J.) (plaintiff's choice of forum is entitled to little deference where the chosen forum is not the situs of material events).

Indeed, Plaintiffs' choice of forum should be given virtually no weight for two primary reasons. First, it is not Plaintiff's home forum. Plaintiff's home forum is Carroll County, Illinois as she resides in Thomson, Illinois, which is located in the Western Division of the Northern District of Illinois. *See Carbonara v. Olmos*, 1993 WL 473651 at *2 (N.D. Ill. Nov. 15, 1993) (Williams, J.) ("plaintiffs choice of forum is given less weight when the plaintiff is a non-resident of the chosen forum, when the plaintiff sues derivatively or as a class representative, and where the cause of action did not conclusively arise in the chosen forum.") Second, the Northern District, Eastern Division lacks any connection to the underlying cause of action. The only incidental, albeit irrelevant, contact the Northern District's Eastern Division allegedly has with this case is that one of Plaintiff's attorneys is resident in Chicago. However, the location of plaintiff's counsel is an impermissible consideration. *Aland v. Kempthorne*, 2007 Wl 4365340, *4, n.5 (N.D. Ill. Dec. 11, 2007) (Zagel, J.); *Flexicorps, Inc. v. Benjamin & Williams Debt Collectors, Inc.*, 2007 WL 1560212, *5, n.3 (N.D .Ill. May 29, 2007) (Kendall, J.). All of the events alleged in this case occurred in Cordova within the Central District of Illinois. Also, the putative class members live and/or work within the Central District. Although Plaintiff resides in Thomson, Illinois, the Central District is closer to her residence than the Eastern Division of the Northern District located in Chicago. (Compl. ¶ 6).[4]

Under such circumstances, Plaintiffs' choice to initiate this action in Cook County, within the Eastern Division of the Northern District of Illinois is accorded virtually no weight. *See Aland v. Kempthorne*, 2007 WL 4365340 at *3 ("[W]hile a large measure of deference is due to the plaintiff's freedom to select his own forum[,] . . .this factor has minimal value where none of the conduct complained of occurred in the forum selected by the plaintiff.") (internal citation omitted); *Ellis Corp. v. Jensen USA, Inc.*, 2003 WL 22111100 at *2 (N.D. Ill. Sept. 9, 2003) (Andersen, J.) (stating that plaintiffs' choice of forum has little importance "when it has 'relatively weak connections with the operative facts giving rise to the claim'"); *Sipes v.*

---

[4] Chicago, Illinois is 147.95 miles away from Thomson, Illinois. In contrast, Rock Island, Illinois, the location of the U.S. District Court for the Central District of Illinois is only a third of that distance, or a total of 52.21 miles away from Thomson. *See e.g.* Mapquest Driving Directions from Chicago to Thomson and from Rock Island to Thomson *available at* <www.mapquest.com/directions> and attached as Exhibit C.

*American Home Prods. Corp.*, 1996 WL 734674, at *1 (N.D. Ill. Dec. 19. 1996) (Alesia, J.). Thus, the fact that Plaintiff's chosen forum is within the Northern District is entitled to little deference.

B.      **The Convenience of the Witnesses Favors Transfer.**

The geographic location of where 3M employed hourly employees, the putative class members who Plaintiff seeks to represent, points to the Central District of Illinois as a more convenient forum for the vast majority of those putative class members.  During the past five years, 3M's Cordova plant has employed about 43 % of its hourly employees in Illinois counties located in the Western Division of the Northern District of Illinois.  (Dec. of Todd Weber, ¶ 15). In contrast, 3M's Cordova plant has employed approximately 101 individuals in the Illinois counties located in the Central District and another approximately 142 individuals in Southeastern Iowa, for a total of 57%.  (Dec. of Todd Weber, ¶ 14).  As such, the Eastern Division of the Northern District of Illinois' connection to the action is minimal.  The Central District of Illinois on the other hand is both the location of the alleged conduct giving rise to the present litigation and is centrally located for the putative class members residing in Western Illinois and Southeastern Iowa.  Accordingly, this factor supports transfer to the Central District of Illinois.

The convenience of the witnesses is often viewed as the most important factor in the transfer balance." *Id.* at 775.  In determining the convenience of the witnesses, courts consider whether the witnesses would be subject to compulsory process and what it will cost to obtain the attendance of willing witnesses.  *Id.*  In this case, 3M's Cordova facility, Plaintiff and most, if not all of the employees are located in or very near the Central District.  Therefore, this factor weighs in favor of transferring the venue to the Central District of Illinois.  *Wade v. Farmers Ins. Group*, 95-2957, 1996 WL 508613 (7th Cir. Aug. 29, 1996) (affirming transfer of venue, in part, because it is more convenient to litigate in the transferee forum).

Moreover, a trial in the Northern District of Illinois would require all witnesses to travel a distance of minimally 150 miles from in and around Cordova to Chicago.[5]  This extraordinary additional expense of lodging in Chicago during trial and for other court proceedings before trial would not be incurred if the case was pending in the Central District of Illinois.  As the *Doage*

---

[5]   *See e.g.* Mapquest.com, Driving Directions from Cordova, Illinois to Chicago, *available at* http://www.mapquest.com/directions and attached as Exhibit D; *see also* (Dec. of Todd Weber ¶ 9).

court recognized, "requiring prospective witnesses and the parties to travel great distances each day of litigation is unnecessary." *Doage,* 950 F. Supp at 261.

In evaluating the particular facts of a case to decide which venue is more convenient, federal courts recognize that increased travel distances, travel expenses, and the disruption of work and home schedules all add to the cost of attendance for witnesses to appear for trial. Courts will thus consider such facts and favor transfer to the forum where such costs may be kept to a minimum. For example, the Fifth Circuit has reasoned that:

> When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is *more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled.*

*In re Volkswagen AG*, 371 F.3d 201, 204-05 (5th Cir. 2004) (emphasis added). Specifically, "[a]dditional [travel] distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment." *Id.* at 205.

Moreover, during the course of litigation and at trial, "the task of scheduling fact witnesses so as to minimize the time when they are removed from their regular work or home responsibilities gets increasingly difficult and complicated when the travel time from their home or work site to the court facility" is hours instead of perhaps minutes. *In re Volkswagen AG* at 205. Here, the "cost of attendance" of proceedings in Chicago for witnesses residing in Western Illinois shows that it will be considerably more convenient for material witnesses if this Court transfers this lawsuit to the Central District.

### a.    Not Transferring this Case to Central District of Illinois Will Severely Inconvenience Key Management Witnesses From the Cordova Area.

Plaintiff alleges that 3M failed to comply with the IMWL, IWPCA and FLSA. (Compl. ¶¶ 29, 43, 56) She seeks money for these allegedly improper pay practices to cover approximately a five-year period. (Compl. Count II, Prayer for Relief). Based upon these allegations, it is clear that key witnesses in this case will come from in or around Cordova, Illinois because in order to make out her claim Plaintiff must initially show, for example, a single decision, policy, or plan of failing to pay for regular and overtime hours. *See Tucker v. Labor*

*Leasing*, 872 F. Supp. 941, 947, n.4 (M.D. Fla. 1994); *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358 (M.D. Ala. 1999) (stating that for plaintiffs to be similarly situated, alleged business practice at issue must have caused the same violation in the same manner.)

Accordingly, in its defense of this lawsuit, 3M anticipates calling management-level employees all of whom reside in the Cordova area and are based at 3M's Cordova plant. (Dec. of Todd Weber ¶¶7-8). These 3M managers are key witnesses against Plaintiff's (and any potential plaintiffs') claims of a corporate policy and practice. Todd Weber's declaration in support of this Motion identifies the positions of 18 potential key witnesses and their expected areas of testimony in this litigation that 3M can *currently identify* as working at its Cordova plant and who live in the Cordova, Illinois area.[6] (Dec. of Todd Weber, ¶8).

Residing in the Cordova area, these 18 witnesses will be required to travel approximately 155 miles, or approximately 3 hours by automobile, to attend trial in Chicago, Illinois. *See* Exhibit D. Once in Chicago, 3M will have to pay for the meal and lodging expenses of these material witnesses because of the distance that they must travel from their residences, adding further to both the witnesses' and 3M's inconvenience. *See In re Volkswagen AG*, 371 F.3d at 205 (recognizing costs of meal and lodging add to inconvenience of witnesses); *A.J. Taft Coal Co., Inc.*, 291 F. Supp. 2d at 1311 ("Courts look to a forum where the trial is most easy, expeditious and inexpensive.") (internal quotation and citation omitted).

Moreover, while traveling to Chicago and attending hearings and a lengthy trial, these key witnesses will be away from their work and homes, substantially disrupting 3M's business operations and the personal schedules of the witnesses. (Dec. of Todd Weber, ¶ 10). Finally, because of the witnesses' key responsibilities for the operation of the Company, their absence from work means 3M would have to delegate some of their responsibilities, while other tasks would simply not be performed at all. *Id.* Thus, the costs of such a disruption to 3M's operations would be great. Such operational interruptions weigh in favor of transferring the case to the Central District. *See In re Volkswagen*, 371 F.3d at 204-05 (venue transfer granted where additional distance and travel time increased witness expenses, making it more difficult to

---

[6] *See Somers v. Flash Tech. Corp. of Am.*, 2000 WL 1280314, at * 3 (S.D. Ind. 2000) (discussing application of court's discretion to transfer on basis of witness location, court said: "This analysis is not merely a numbers game: what is significant is the substance and materiality of potential witnesses' testimony."); *see also Becnel v. Smile Cmty Action Agency, Inc.*, 207 F.Supp.2d 520, 522 (M.D. La. 2001); *Gundle Lining Const. Corp. v. Fireman's Fund Ins. Co*., 844 F.Supp. 1163, 1166 (S.D. Tex. 1994); *In re Eastern Dist. Repetitive Stress Injury Lit.*, 850 F.Supp. 188, 194 (E.D.N.Y. 1994).

schedule key witnesses away from their regular employment). It is well settled that "[a] plaintiff may not, by choice of an inconvenient forum, inflict upon the defendant expense and trouble not necessary to plaintiff's own right to pursue [her] remedy." *U.S. v. General Motors Corp.*, 183 F. Supp. 858, 860 (S.D.N.Y. 1960). Because this lawsuit, as pled, is potentially a class action involving many witnesses largely from Western Illinois and Southeastern Iowa, this factor weighs in favor of transfer.

> **b.  Not Transferring this Case to the Central District Will Severely Inconvenience Several Key Employee Witnesses From Western Illinois and Southeastern Iowa.**

Transfer is also appropriate because, in addition to 3M's management witnesses, 3M faces the prospect of paying for the travel expenses to Chicago of *dozens of other material witnesses*. Because Plaintiff alleges regular and overtime payment violations, 3M's defense will have to include material witnesses, most of whom are Cordova plant employees and the supervisors for whom each worked. *Citibank, N.A. v. Affinity Processing Corp.*, 248 F. Supp. 2d 172, 177 (E.D.N.Y. 2003) (convenience of witnesses weighed in favor of transfer because more potential witnesses resided outside of plaintiff's choice of forum).

At 3M's expense, these plant employees from Western Illinois and Southeastern Iowa are key persons who would be able to provide a court with the fact-specific, individualized inquiry into each putative class member's actual day-to-day activities that are the subject of this suit.[7] (Dec. of Todd Weber, ¶11). Transferring this case to the Central District, where the plant is located and many of the material witness either work, reside or both, would significantly reduce their "cost of attendance." *Id*. at ¶ 12.

> **C.  The "Ease of Access to Sources of Proof" Favors Transfer to the Central District of Illinois.**

Courts have long held that the location of documentary evidence for a case is a factor to consider when deciding a motion to transfer venue. *A.J. Taft Coal Co., Inc.*, 291 F. Supp. 2d at 1311 (finding location of documents or other sources of proof a "practical reason[]" for transfer);

---

[7] Courts around the country agree that allegations of overtime violations require a fact-specific, individualized inquiry into each putative class member's day-to-day activities and pay history, about which employees and their managers are best able to testify. *See, e.g., Ray v. Motel 6 Operating, L.P.*, 1996 WL 938231 (D. Minn. Mar. 18, 1996) (noting differences among potential class members including, *inter alia*, their managers, properties where work took place, and the amount of overtime allegedly worked); *Tucker v. Labor Leasing, Inc.*, 872 F. Supp. at 949 (noting pay and shift differences, as well as varying involvement of supervisory levels).

*see also In Re Volkswagen AG,* 371 F.3d at 203; *In Re Horseshoe Entm't,* 337 F.3d at 434 (location of books and records factor in favor of transfer); *Mobil Oil Corp. v. W.R. Grace & Company*, 334 F.Supp. 117, 124 (S.D. Tex. 1971) (courts should consider "[t]he proximity of each party's documentary and other tangible evidence to the forums in question"). Furthermore, "courts look at the location of evidence in a 1404(a) motion when documents are particularly bulky or difficult to transport, or proof that it is somehow a greater imposition for defendant to bring its evidence to [the current forum] than for plaintiff to bring its evidence to the moving party's proposed forum." *Citibank, N.A. v. Affinity Processing Corp.*, 248 F.Supp.2d at 177 (internal quotation and citation omitted).

Where, as here, there are few if any sources of proof in this District,[8] and the location of documentary proof and personnel records can be found in another District, this factor weighs in favor of transfer. *See Burt v. C.H. Robinson Worldwide, Inc.*, 2007 WL 781736 at *3 (N.D. Ill. 2007) (Kocoras, J.). Here, Plaintiff alleges that 3M engages in a pattern and practice of not properly paying regular or overtime pay to past or current 3M employees for all time worked. (Compl. ¶¶ 29, 43, 56). Those events and the sources of proof relating to them are *not* just focused upon Plaintiff's choice of forum in Chicago, Illinois, but are instead linked to 3M's general policies and payment procedures and records for the more than 426 current and former hourly employees that are stored and maintained at 3M's Cordova plant. (Dec. of Todd Weber, ¶¶ 6, 13). Indeed, 3M maintains in Cordova, Illinois the relevant compensation records for *all* of the potential plaintiffs in this case. *Id.* at ¶6. Moreover, 3M's management in Cordova, Illinois implements its general human resources and pay policies and practices. *Id.* at ¶ 8.

Clearly, the potentially relevant documents and records (i.e., compensation records, pay policies and practices) for 426 employees are extremely voluminous. *Id.* at ¶ 8. Preparing such large volumes of documents for transportation and storing them in a secure off-site facility to protect confidential commercial and private information about 3M's employees would significantly disrupt 3M's business operations because of the expense, time, and personnel required to perform such tasks. *Id.* at ¶ 9. This Court's transfer of this lawsuit to the Central District of Illinois, however, would greatly minimize if not eliminate these costs and risks.

---

[8] 3M is, in fact, unaware of any relevant proof in the Northern District, with the possible exception of Plaintiff's own documents, which may have been transferred to her counsel. As discussed *infra*, however, the location of Plaintiff's counsel, and inferentially, Plaintiff's documents at that location, carries no weight in the change of venue analysis.

Accordingly, the balance of factors favors transferring this case to the Central District.

In sum, the vast majority of witnesses and evidence is located within the Central District of Illinois. These facts particularly weigh in favor of a venue transfer to the Central District. *H.B. Sher*man, 979 F. Supp. at 631; *Pillar*, 2001 WL 766887, at * 1; *Doage*, 950 F. Supp. at 260-61; *Whitehead v. Woolsey*, 1993 WL 443396 at *1-2 (N.D. Ill. Oct. 29, 1993) (Andersen, J.).

D.     The "Interest of Justice" Favors Transfer to the Central District.

Section 1404(a)'s "interest of justice" requirement focuses on the efficient administration of the court system, and not on the private interests of the parties. *Jennings v. Univ. of North Carolina at Chapel Hill*, 1999 WL 301669, at *2 (N.D. Ill. April 30, 1999) (Williams, J.). The interest of justice component embraces traditional notions of judicial economy, rather than the private interests of litigants and their witnesses. *Coleman*, 2004 WL 609369 at *1. It includes such considerations as (1) the speed at which the case will proceed to trial; (2) the court's familiarity with the applicable law; (3) the desirability of resolving controversies in their locale; and (4) the relation of the community to the occurrence at issue. *Id.* The administration of justice is served more efficiently when the action is litigated in the forum that is "closer to the action." *Jennings*, 1999 WL 301669, at *3; *Paul v. Land's End, Inc.*, 742 F. Supp. 512, 514 (N.D. Ill. 1990) (J. Bua).

1.     The Central District of Illinois Has a Significantly Smaller Civil Docket.

Here, the interest of justice favors transfer because the Central District of Illinois has a smaller civil docket. A comparison of the "docket conditions" between Plaintiff's choice of forum and the transferee court is a relevant factor for determining if the "interest of justice" falls in favor of a transfer of venue, particularly when combined with other factors favoring a transfer of venue. *Heller Fin. Inc.,* 883 F.2d at 1293; *Acterna, L.L.C. v. Adtech, Inc.,* 129 F.Supp.2d 936, 940 (E.D. Va. 2001).

Statistics from the Administrative Office of the United States Courts show that the Central District of Illinois had 944 pending civil cases in March of 2007, and that the Northern District of Illinois had 7,209 pending civil cases.[9] Thus, the Central District of Illinois has a civil

---

[9] *See* Federal Judicial Caseload Statistics: March 31, 2007, Table C-1. U.S. District Courts –Civil Cases Commenced, Terminated, and Pending During the 12-Month Period Ending March 31, 2007, at 41, Office of Judges Programs Statistics Division of the Administrative Office of the United States Courts (2007), available at <http://www.uscourts.gov/caseload2007/contents.html > and attached as Exhibit E.

docket that amounts to *only 13%* of the pending cases in the Northern District of Illinois. Accordingly, this factor weighs heavily in favor of transferring this case to Central District.

Moreover, a comparison of the judge-to-case ratio in the two districts also favors transfer of this case to the Central District. There are 10 active judges in the Central District and 44 judges in the Northern District. As such, the Central District can take advantage of its 1:94, judge-to-case ratio, whereas the Northern District bears a ratio of 1:164. Consequently, each judge in the Northern District has almost *twice* as many cases as a judge in the Central District. Thus, the interest of justice favors transfer to the Central District where each judge maintains a much smaller caseload.

### 2. The Central District of Illinois is the Situs of the Alleged Actions Giving Rise to this Lawsuit.

In this case, the situs of the alleged acts which give rise to Plaintiff's claims in this case are in the Central District of Illinois. The Central District is undoubtedly the forum with virtually the only significant contacts to the litigation. The only connections that the Northern District, Eastern Division may have with the underlying cause of action is that 3M has a registered agent for service of process in Chicago, as it does in many cities, and Plaintiff happens to have retained counsel who are located in or near there. All of the material events occurred at the Cordova plant, which is located in the Central District. Specifically, Plaintiff takes issue with how employees perform their work and are compensated within the plant. Issues of time spent performing certain activities will likely become central to the resolution of Plaintiff's claims. The Cordova plant would be available and closer for a site visit by the jury, if necessary, which buttresses transfer to the Central District. *See Allen v. Sheraton Corp.*, 1980 U.S. Dist. LEXIS 16755, at *5-*6 (N.D. Ill. May 20, 1980) (transferring case to federal district court in Boston, Massachusetts in the best interests of justice).

Further, at a minimum, this case involves a number of co-workers and numerous supervisors who will be called to testify regarding how the employees in Cordova perform their work. All of these individuals reside closer to the Central District. Thus, the Central District of Illinois is undoubtedly the forum "closer to the action." Accordingly, the administration of justice and the efficiency of the court system would be best served by transferring the case to the Central District of Illinois.

**3.    The Central District of Illinois is Related to the Community at Issue.**

Residents of Cordova, Illinois and those within the Central District have an interest in having this action transferred to their judicial district because 3M is a local employer and the alleged wage violations purportedly took place there.  It is a goal of the federal court system to allow members of the community from which the controversy arose to sit on the jury panel and decide the case.  *Doage*, 950 F. Supp. at 260.

**VI.    CONCLUSION**

The §1404(a) factors all heavily weigh in favor of transfer of this case, notwithstanding Plaintiff's original choice of venue.  Therefore, for all of the above reasons, this Court should transfer this case to the Rock Island Division of the United States District Court for the Central District of Illinois.

Respectfully submitted,

3M COMPANY

By:  /s/ Stephanie Seay Kelly

One of Its Attorneys

John A. Ybarra (#06196983)
Stephanie Seay Kelly (#06275880)
Veronica Li (#6286719)
LITTLER MENDELSON
A Professional Corporation
200 N. LaSalle Street
Suite 2900
Chicago, IL  60601
312.372.5520

Dated:  May 2, 2008

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she served a copy of the foregoing *Defendant's Memorandum of Law In Support of Its Motion to Transfer Venue* to the following via U.S. Mail, postage prepaid, before the hour of 5:00 pm, on May 2, 2008:

Robin B. Potter
ROBIN POTTER & ASSOCIATES, P.C.
111 East Wacker Drive
Suite 2660
Chicago, Illinois 60601

Colleen McLaughlin
LAW OFFICES OF COLLEEN MCLAUGHLIN
1751 South Naperville Road
Suite 209
Wheaton, Illinois 60563

By:_____s/Stephanie Seay Kelly_____
Stephanie Seay Kelly

Firmwide:85095768.1 026010.1001

-15-

# EXHIBIT A

RECEIVED
RECEIVED
DEC 1 2007
ROBIN POTTER &
ASSOCIATES, P.C.
ROBIN POTTER
ASSOCIATES, P.C.

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

BARBARA J. LUEDERS, individually and on )
behalf of a class of similarly situated persons, )
                                )
          Plaintiff, )
                                )
       vs. )
                                  )
3M COMPANY, a Delaware corporation, )
                                  )
          Defendant. )

**07CH36038**

Case No.

JURY DEMAND

COPY

**CLASS ACTION COMPLAINT FOR AN**
**ACCOUNTING, INJUNCTIVE RELIEF AND RECOVERY OF WAGES**

Plaintiff, BARBARA LUEDERS, individually and on behalf of a class of similarly situated persons, by their attorneys, the LAW OFFICES OF COLLEEN M. MCLAUGHLIN and ROBIN POTTER AND ASSOCIATES, P.C., and pursuant to 735 ILCS 5/2-801 *et seq.* Class Actions; 820 ILCS 115/1 *et seq.*, the Wage Payment and Collection Act; 820 ILCS 105/1 *et seq.*, the Illinois Minimum Wage Act; 29 U.S.C. §201 *et seq.* the Fair Labor Standards Act; and 20 U.S.C. §251 *et seq.*, the Portal to Portal Act, complains of Defendant 3M COMPANY ("3M") as follows:

**JURISDICTION AND VENUE**

1.    Defendant has violated and continues to violate the Illinois Minimum Wage Law ("IMWL"), 820 ILCS §105/1 *et seq.* and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS §115/1 *et seq.* by refusing and failing to pay Plaintiff and other similarly situated employees wages for all hours worked including overtime wages. In addition, Defendant has violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et seq.*, and the Portal to Portal Act, 29 U.S.C. §251 *et seq.*, by refusing and failing to pay Plaintiff at least minimum wage

for all hours worked and overtime wages at the rate of one and one-half times her regular hourly

rate for all hours worked over 40 in a week.

2.       This Court has jurisdiction over these claims under the IMWL, 820 ILCS §105/12(a), the

IWPCA, 820 ILCS §115/11 and the FLSA, 29 U.S.C. §203(d).

3.       Venue is proper in this Court because 3M does business in Cook County, Illinois and its

registered agent is located in Cook County, Illinois.

## PARTIES

4.       3M is a Delaware corporation, headquartered in St. Paul, Minnesota, and is involved in

the research, manufacture and marketing of a great variety of products, including adhesives,

magnetic tape, photographic products, medical, dental and office products. Its plant located in

Cordova, Illinois produces specialty adhesives. On information and belief, Defendant 3M

typically employs, at its facility in Cordova, Illinois, in excess of 300 non-exempt, hourly

employees.

5.       Defendant 3M is an "employer" within the meaning of the IMWL, 820 ILCS §105/3, the

IWPCA, 820 ILCS 115/2, the FLSA, 29 U.S.C. §203(d) and the Portal to Portal Act, 29 U.S.C.

§262(a).

6.       Plaintiff Lueders resides in Thomson, Illinois.  Plaintiff Lueders has consented to being a

party plaintiff in this action.  Plaintiff worked as a full-time, non-exempt, hourly employee at the

3M Cordova facility from January 29, 1990 to May 24, 2007. During the course of her

employment, Lueders worked as a Chemical Processor in various units and buildings throughout

the Cordova facility.

7.     At all relevant times, Plaintiff and the class, as defined below, have been covered "employees" within the meaning of the IMWL, 820 ILCS § 105/3(d), the IWPCA, 820 ILCS 115/2, the FLSA, 29 U.S.C. §203(e)(1) and the Portal to Portal Act, 29 U.S.C. §262(a).

8.     The acts complained of herein have occurred at all times from at least November 2002, and continuing through the present.

### FACTS COMMON TO ALL COUNTS

9.     The 3M Cordova facility occupies over 700 acres and is comprised of several factories in over a dozen buildings. Employees work around and directly with flammable liquids and chemicals. The Cordova facility operates around the clock, 7 days a week.

10.     The Cordova plant consists of two groups, Production and Plant Engineering. Production includes Chemical and Oxide Processors, Material Handlers, Finished Good Handlers, Environmental Material Handlers, and Yard Keepers. Plant Engineering includes Mechanical, Electrical, Utilities, Servicepersons, Apprentices and Helpers.

11.     Employees all carry identification badges and are required to swipe in and out at the guard gate to gain access to or leave the facility. Thus, the exact time an employee arrives at and departs the facility is recorded.

12.     3M plant employees work one of three types of schedules. First, there is the "day shift," which consists of one 8-hour shift. Shift "start" time is normally at 0700 and shift "end" time is normally at 1500.

13.     The second type of shift is referred to by 3M as "Three-Shift Operation," which consists of three 8-hour shifts. The first shift normally "starts" at 0700 or 0800.

14.    The third type of shift is referred to by 3M as the "4-Crew, 12 Hour Shift Operation," which consists of two 12-hour shifts that "begin" with the start of an employee's regularly scheduled shift. Day shift (code 1) is from 0600-1800 and night shift (code 3) is from 1800 - 0600.

15.    3M's policy manual states that employees on a straight 8-hour work schedule will be paid "time and one-half for work in excess of 8 hours in any day for which overtime has not been paid on some other basis." Employees working an 8-hour shift are also entitled to a paid 20-minute lunch period and two paid 10-minute rest periods.

16.    3M's policy manual states that employees working a 12-hour rotation work schedule will be paid "time and one-half for work in excess of 40 hours per workweek for which overtime has not been paid on some other basis." Employees working a 12-hour shift are entitled to two 30-minute paid meal periods and up to 30 additional minutes of paid rest breaks. In addition, employees will be paid two times their regular base pay for all consecutive hours worked over 12.

17.    Employees are paid every 2 weeks. Employees assigned to the 12-Hour Shift Operation schedule will generally work 36 hours one week and 48 hours the next week.

18.    3M's policy manual also states that "paid absences such as vacations and holidays shall be considered time worked for the purpose of determining overtime payment."

19.    The vast majority of Production and Plant Engineering employees are required by 3M as well as the nature of their work to wear flame resistant uniforms and other personal protective equipment ("PPE") such as eye protection, hard hats, ear plugs and steel-toed ESD rated safety shoes. Uniforms, eye protection, hard hats, ear plugs and steel-toed, shock resistant safety shoes

are donned and doffed at 3M. At the end of shift, employees are instructed to shower before changing into their street clothes.

20.     In addition to being required to change into and out of their uniforms and other PPE on the premises, most production employees are also required to report to their work stations, in work clothing attire, 20 minutes prior to the official start of their shift so that they can relieve their counterpart on the prior shift.

21.     3M's employee manual instructs employees as follows:

> **Making Proper Shift Change**
> The work requirement is for everyone to make a proper shift change. This involves communication at the "work station." The responsibility is to the unit, the product, and to the person being relieved. Shift change at the workstation provides both employees an opportunity to discuss the process and the processes being monitored for safety and quality issues. Shift changes that occur out of the work area are not acceptable.

22.     The pre and post shift activities described herein are integral and indispensable activities that are performed for the benefit of the employer. These activities are performed daily and regularly and the time involved is not *de minimis*. The Plaintiff and the class are entitled to be paid for all time engaged in these activities.

23.     Although it is the employer's burden to keep accurate employee time records under 29 U.S.C. §211(c); 820 ILCS §105/8, 3M requires its employees to keep their own time records for payroll purposes. Employees are instructed to record only their total time to be paid for any given shift, which is less than the time that they actually worked. Employees are not allowed to record the exact times they start and end their work day or the exact times they leave their work station or return to their work stations for meal breaks. For example, an employee would typically record only "8 hours" or "12 hours" for any given date worked. In actuality, that employee may have

worked as much as 8 ½ to 9 hours, depending on how long it took them to change into their uniform and walk to their work station in order to arrive and start work 20 minutes prior to the official start of their shift and to change out of their uniforms and back into street clothes at the end of their shift. Supervisors are responsible for checking the employee's recorded total time for any given shift. Only the employee and his/her supervisor are authorized to record an individual employee's time.

24.    Employees are not paid at either their regular or applicable overtime rate for the time it takes to don their uniforms and other PPE.

25.    Employees are not paid for the time it takes to walk from the locker room to their work stations prior to the start of their shift.

26.    Employees are not paid at either their regular or applicable overtime rate for reporting to their work stations 20 minutes prior to the official start of their shifts.

27.    Although most of the time, employees are relieved from duty prior to the official end of shift, employees do not always complete the tasks of walking to the locker room, showering, and changing into street clothes prior to the official end of their shift. Thus, employees are not paid for all the time required to perform these tasks.

28.    Defendant, 3M, was aware of its obligation to pay employees for all hours worked and to pay overtime and intentionally chose not to pay Plaintiff and the class. Defendant acted in bad faith in failing to compensate Plaintiff and the class for all work performed.

## CLASS ALLEGATIONS – IMWL and IWPCA

29.    Plaintiff seeks to represent a class of all former and current, non-exempt, hourly plant employees who worked at the Cordova 3M facility at any time between November of 2002 and

continuing through the present, who are/were required to don and doff uniforms and other PPE on 3M premises, and/or who are/were required to report to their workstations approximately 20 minutes prior to the official start of their shift, and who were not paid either their regular or overtime pay for engaging in these activities.

30.    The Plaintiff and the members of the class have a commonality of interest in the subject matter (Defendant's common company wide personnel policies) and the remedy sought (payment by Defendant of all unpaid wages at their applicable regular or overtime rate and penalties as allowed by law).

31.    There are several predominate questions of fact common to Plaintiff and the class, including (1) the fact that Plaintiff and the class are all non-exempt employees who worked in similar manufacturing-related positions for 3M; (2) the fact that Plaintiff and the class were/are all compensated on an hourly basis; (3) the fact that Plaintiff and the class were/are all subject to the same wage and hour policies and procedures including hours paid at the employee's overtime rate; (4) the fact that Plaintiff and the class were/are all required to record their total time on the same computerized system; (5) the fact that Plaintiff and the class were/are subject to the same polices and procedures concerning work related activities such as the time they were expected to report to their work stations, and the requirement to don and doff their Personal Protection Equipment, including uniforms, on 3M premises; and (6) the fact that Plaintiff and the class were/are all compensated by the same payroll department, on the basis of common time records, payroll policies, documents and computer systems.

32.    In addition, there are questions of law common to Plaintiff and the class, including but not limited to: (1) whether donning and doffing uniforms and walking to and from work stations

and locker rooms is compensable "work" time; (2) whether the Defendant's failure to pay

Plaintiff and the class wages at all for certain hours worked violated the IMWL and the IWPCA;

(3) whether the Defendants' failure to pay Plaintiff and the class overtime at the statutory rate of

one and one-half their regular hourly rate for all hours worked over forty in a one-week period

violated Illinois law; and (4) whether the Defendants' failure to pay Plaintiff and the class

overtime at their promised rate of pay for all hours worked over 8 or 12 hours in a day violated

Illinois law.

33.      The class is sufficiently numerous to make joinder impracticable. On information and

belief, at any given time, the Defendant employs over 300 non-exempt, hourly employees who

have engaged in the compensable pre and post shift activities described herein and have not been

paid for same. This factor alone makes joinder impracticable.

34.      Plaintiff's claims are typical of the claims of the class.  Plaintiff individually suffered and

was damaged by all violations enumerated above and complained of herein. Plaintiff's claims are

typical of those of the proposed class in all material respects.

35.      Plaintiff is able to fairly and adequately represent and protect the interests of the class as

whole. Plaintiff has willingly undertaken and is able to prosecute these claims on behalf of

herself and all similarly-situated persons.

36.      This is not a collusive or friendly action.  Plaintiff has retained counsel experienced in

wage and hour and in class action litigation.

37.      A class action is superior to other available means for the fair and efficient adjudication

of the controversy alleged in this Complaint.  Class action treatment will permit a large number

of similarly situated persons to prosecute their common claims in a single forum simultaneously,

# EXHIBIT B

## DECLARATION OF TODD WEBER

I, TODD WEBER, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct based on personal knowledge.

1.     I am currently employed by 3M Company ("3M" or "Company") as the Human Resources Manager of 3M's plant in Cordova, Illinois ("Cordova Plant"). I have been the Human Resources Manager of the Cordova Plant since June 1, 2007. Prior to my promotion to Human Resources Manager, I worked as a Human Resources Supervisor from December 2005 to June 1, 2007 at the Cordova plant.

2.     3M is headquartered in St. Paul, Minnesota.

3.     As Human Resources Manager, I am familiar with the Cordova Plant's operations. I am also familiar with the Company's procedures related to human resources and the processing of payroll.

4.     The Cordova Plant is a materials resource plant. This facility makes a wide variety of specialty chemicals and adhesives for use in the manufacturing process. Ultimately, the products manufactured by 3M go into industrial, commercial and consumer applications throughout the world for a broad range of end-users and customers.

5.     The Cordova Plant is located in Rock Island County, Illinois. The facility is also located very close to the border between Illinois and Iowa. In fact, the facility is located just off of the Mississippi River that borders Illinois on the west and Iowa on the east and separating the two states. Some of the employees who work at the Cordova Plant choose to reside and live in Iowa.

6.     Many documents and much information related to 3M's employees who work at the Cordova Plant are kept and maintained on site. For example, the Cordova plant houses

employee personnel files, 3M's general policies and wage payment procedures, and documents that record the work performed by the employees who work there. 3M's management at the Cordova Plant implements 3M's general human resources and pay policies and practices in Cordova.

7.    If physically produced, 3M's documents and records, such as compensation records, general human resources and pay policies and practices would be extremely voluminous and would require a major and expensive undertaking to organize, copy, store, secure, and transport outside of the Cordova, Illinois area. Physically producing, transporting, storing, and securing such documents outside of the Cordova area would also disrupt 3M's business operations because of the expense, time, and personnel required to perform such tasks.

8.    Witnesses who will likely be called to testify for the Company include 3M's management-level employees who have knowledge about how employees at the Cordova Plant perform their work, as well as, Plaintiff's allegations in her Complaint. Additionally, 3M's general and shift supervisors, of which there are currently over sixteen (16), are responsible to review the time records for the employees they supervise. These management-level employees all reside and live in the Cordova area and are also based at and work out of 3M's Cordova Plant.

9.    Such likely witnesses include the Plant Manager, Manufacturing Product Manager, Internals Factory, Manufacturing Product Manager, Electronics Factory, Plant Engineering Manager, Supply Chain Manager and Environmental Health Safety & Regulatory Manager all of whom are knowledgeable about plant operations, policies and personnel policies and procedures, and all of whom work at the Cordova Plant and/or live in the Cordova area. Other likely witnesses include the Plant Quality Manager, Human Resources Manager, Training Administrator, Information Technology Supervisor. Additional likely witnesses would be the

Supervisors for Electronics, Internals, the Warehouse, Shipping and Receiving and Plant Engineering who are knowledgeable about plant operations and procedures in their respective departments. All of these witnesses, who total eighteen (18) individuals work and/or live in the Cordova area.

10.    These likely witnesses who reside and work in the Cordova area will be required to travel about 150 miles one-way to attend trial if held in Chicago, Illinois. To take such a trip by car would take approximately three (3) hours each way.

11.    Attendance at hearings and a lengthy trial in Chicago will require these key witnesses to be away from their work and homes, which would substantially disrupt 3M's business operations and the personal schedules of the witnesses. Moreover, because these likely witnesses hold key responsibilities for the operation of the Cordova Plant, scheduling time away from work would be difficult because their responsibilities would have to be delegated to others, or simply not performed at all.

12.    Key witnesses expected to testify in this case would also include the hourly employees who work at the Cordova Plant. These hourly employees would be able to provide the court with fact-specific, individualized information regarding their particular day-to-day activities at work.

13.    Of course, if hourly employees must leave their jobs to testify at a hearing or trial in Chicago, the business operations of the Cordova Plant would be disrupted because of the costs involved in accommodating the employees' absences. Although this is a cost that 3M would bear regardless of the venue for trial, holding trial in the Cordova area would reduce those travel costs for 3M for all of the employees who do not reside in the Chicago area. This is because

lodging in a metropolitan area such as Chicago is inevitably higher than the costs for lodging within the area of the Central District of Illinois, comparatively.

14.    Plaintiff, Barbara Lueders, was employed at 3M's Cordova Plant from January 29, 1990 to May 24, 2007.  During the time that Plaintiff was employed at the Cordova Plant, 3M employed a total of approximately 426 hourly employees at the Cordova Plant.  Most of these 426 former or current employees reside in or near Rock Island County, Illinois.

15.    Specifically, of these 426 former or current hourly employees at the Cordova Plant, approximately 101 employees reside and live in Illinois counties located within the United States District Court for the Central District of Illinois.  Additionally, another approximately 142 employees reside and live in Southeastern Iowa.  Therefore, 243 current and former employees or approximately 57% of the former or current hourly employees at the Cordova Plant reside and live either within the venue parameters of the United States District Court for the Central District of Illinois or in Southeastern Iowa, very close to the Central District.

16.    To the contrary, about 179 of the 426 former or current hourly employees at the Cordova Plant reside and live in Illinois counties located within the United States District Court for the Northern District of Illinois, Western Division, including Carroll County and Whiteside County, both of which sit on the border of Rock Island County.  Carroll and Whiteside Counties are both considerably closer to Rock Island County, than to Cook County, Chicago, Illinois.

Executed by:

Todd Weber

Date:  May 2 , 2008

-4-

# EXHIBIT C





**A: Chicago, IL**

| | | |
|---|---|---|
| START | **1:** Start out going EAST on W COURT PL toward N LASALLE ST. | 0.0 mi |
| | **2:** Turn RIGHT onto N LASALLE ST. | 0.3 mi |
| | **3:** Turn RIGHT onto W ADAMS ST. | 0.1 mi |
| | **4:** Turn LEFT onto S WELLS ST. | 0.3 mi |
| | **5:** Turn RIGHT onto W CONGRESS PKWY. | 0.2 mi |
| WE ST 290 | **6:** W CONGRESS PKWY becomes I-290 W/EISENHOWER EXPY W. | 13.9 mi |
| WE ST 88 | **7:** Keep LEFT to take I-88 W via EXIT 15A toward INDIANA/AURORA (Portions toll). | 104.1 mi |
| EXIT | **8:** Take EXIT 36 toward US-30 W/CLINTON. | 0.3 mi |
| | **9:** Merge onto COMO RD. | 0.7 mi |
| WEST 30 | **10:** Stay STRAIGHT to go onto LINCOLN RD/US-30 W. | 8.0 mi |
| | **11:** Turn RIGHT onto LYNDON RD/CR-7. | 6.5 mi |
| | **12:** Turn LEFT onto SPRING VALLEY RD/CR-34. | 4.0 mi |
| | **13:** Turn RIGHT onto CARROLL RD/IL-78. Continue to follow IL-78. | 4.0 mi |
| | **14:** Turn LEFT onto THOMSON RD. | 3.1 mi |

 **15:** THOMSON RD becomes ARGO FAY RD.                    2.6 mi

**END** **16:** End at Thomson, IL

Estimated Time: 2.0 hours 38 minutes     Estimated Distance: 147.95 miles

**B: Thomson, IL**

Total Time: 2.0 hours 38 minutes     Total Distance: 147.95 miles



Directions and maps are informational only. We make no warranties on the accuracy of their content, road conditions or route usability or expeditiousness. You assume all risk of use. MapQuest and its suppliers shall not be liable to you for any loss or delay resulting from your use of MapQuest. Your use of MapQuest means you agree to our Terms of Use



**A: Rock Island, IL**

| | | |
|---|---|---|
| START | **1:** Start out going WEST on 3RD AVE toward 15TH ST/US-67. | 0.0 mi |
| | **2:** Turn RIGHT onto US-67/15TH ST. Continue to follow US-67 (Crossing into IOWA). | 0.8 mi |
| RAMP | **3:** Take the ramp toward US-67 N. | 0.1 mi |
| | **4:** Turn SLIGHT RIGHT onto N GAINES ST. | 0.0 mi |
| | **5:** Turn LEFT onto W RIVER DR/US-61/US-67. | 0.5 mi |
| NORTH 61 | **6:** Turn LEFT onto S BRADY ST/US-61 N. Continue to follow US-61 N. | 19.8 mi |
| EAST 30 | **7:** Merge onto US-30 E via EXIT 137 toward DE WITT/CLINTON. | 20.4 mi |
| | **8:** Turn RIGHT onto US-30/8TH AVE S. Continue to follow US-30 (Crossing into ILLINOIS). | 1.8 mi |
| NORTH 84 | **9:** Turn LEFT onto IL-84 N/WALLER RD. Continue to follow IL-84 N. | 8.8 mi |
| | **10:** Turn RIGHT onto ARGO FAY RD/W MAIN ST. | 0.0 mi |
| END | **11:** End at Thomson, IL | |

Estimated Time: 1 hour 7 minutes    Estimated Distance: 52.21 miles

**B: Thomson, IL**

**Total Time: 1 hour 7 minutes    Total Distance: 52.21 miles**



Directions and maps are informational only. We make no warranties on the accuracy of their content, road conditions or route usability or expeditiousness. You assume all risk of use. MapQuest and its suppliers shall not be liable to you for any loss or delay resulting from your use of MapQuest. Your use of MapQuest means you agree to our Terms of Use

# EXHIBIT D

# MAPQUEST.



University of **Phoenix**
Thinking ahead.

Earn your
degree in one
of the most
convenient and
efficient ways
possible.

University of  next level, here I come

**A: Cordova, IL**

| | | | |
|---|---|---|---|
| **START** | **1:** Start out going EAST on MAIN ST/MAIN AVE toward 10TH ST. | 0.1 mi |
| → | **2:** Turn RIGHT onto 11TH ST S. | 0.2 mi |
| ↑ | **3:** 11TH ST S becomes CR-BB. | 4.4 mi |
| ↑ | **4:** Stay STRAIGHT to go onto 150TH AVE N. | 2.5 mi |
| ↑ | **5:** 150TH AVE N becomes CORDOVA RD/CR-25. | 5.7 mi |
| ↑ | **6:** Stay STRAIGHT to go onto 7TH AVE. | 0.1 mi |
| ← | **7:** Turn LEFT onto MOLINE RD. | 0.2 mi |
| ← | **8:** Turn LEFT onto ALBANY RD/CR-13 N. | 2.2 mi |
| EAST 88 | **9:** Merge onto I-88 E toward DIXON (Portions toll). | 121.3 mi |
| EAST 290 | **10:** I-88 E becomes I-290 E/EISENHOWER EXPY E (Portions toll). | 14.0 mi |
| WEST 90 | **11:** Merge onto I-90 W/I-94 W/KENNEDY EXPY W toward WISCONSIN. | 0.8 mi |
| EXIT | **12:** Take the EAST WASHINGTON BLVD exit, EXIT 51C. | 0.1 mi |
| → | **13:** Turn RIGHT onto W WASHINGTON BLVD. | 0.3 mi |
| ↑ | **14:** W WASHINGTON BLVD becomes W WASHINGTON ST. | 0.2 mi |

Case 1:08-cv-02457     Document 9-5     Filed 05/02/2008     Page 3 of 3



**15:** Turn LEFT onto N UPPER WACKER DR/N WACKER DR. Continue to follow N WACKER DR.  0.4 mi

**16:** Turn RIGHT onto N LASALLE ST.  0.2 mi

**17:** Turn RIGHT onto W COURT PL.  0.0 mi

**END** **18:** End at Chicago, IL

Estimated Time: 2.0 hours 43 minutes     Estimated Distance: 152.68 miles

**B: Chicago, IL**

**Total Time: 2.0 hours 43 minutes     Total Distance: 152.68 miles**



Directions and maps are informational only. We make no warranties on the accuracy of their content, road conditions or route usability or expeditiousness. You assume all risk of use. MapQuest and its suppliers shall not be liable to you for any loss or delay resulting from your use of MapQuest. Your use of MapQuest means you agree to our Terms of Use

# EXHIBIT E

# Table C-1. (March 31, 2007—Continued)

| Circuit and District | Total Civil Cases | | | | U.S. Civil Cases | | | | Private Civil Cases | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pending Mar. 31, 2006 | Commenced | Terminated | Pending Mar. 31, 2007 | Pending Mar. 31, 2006 | Commenced | Terminated | Pending Mar. 31, 2007 | Pending Mar. 31, 2006 | Commenced | Terminated | Pending Mar. 31, 2007 |
| **5TH** | **36,697** | **36,166** | **29,851** | **43,012** | **4,447** | **4,907** | **5,231** | **4,123** | **32,250** | **31,259** | **24,620** | **38,889** |
| LA,E | 8,217 | 11,586 | 4,826 | 14,977 | 251 | 389 | 298 | 342 | 7,966 | 11,197 | 4,528 | 14,635 |
| LA,M | 8,778 | 1,001 | 1,075 | 8,704 | 82 | 138 | 126 | 94 | 8,696 | 863 | 949 | 8,610 |
| LA,W | 2,258 | 2,549 | 2,433 | 2,374 | 575 | 462 | 614 | 423 | 1,683 | 2,087 | 1,819 | 1,951 |
| MS,N | 1,493 | 942 | 1,160 | 1,275 | 114 | 85 | 94 | 105 | 1,379 | 857 | 1,066 | 1,170 |
| MS,S | 2,764 | 2,892 | 2,855 | 2,801 | 250 | 198 | 215 | 233 | 2,514 | 2,694 | 2,640 | 2,568 |
| TX,E | 3,413 | 4,487 | 4,677 | 3,223 | 643 | 740 | 821 | 562 | 2,770 | 3,747 | 3,856 | 2,661 |
| TX,N | 2,422 | 3,034 | 2,850 | 2,606 | 503 | 473 | 479 | 497 | 1,919 | 2,561 | 2,371 | 2,109 |
| TX,S | 4,871 | 6,437 | 6,755 | 4,553 | 1,266 | 1,604 | 1,752 | 1,118 | 3,605 | 4,833 | 5,003 | 3,435 |
| TX,W | 2,481 | 3,238 | 3,220 | 2,499 | 763 | 818 | 832 | 749 | 1,718 | 2,420 | 2,388 | 1,750 |
| **6TH** | **24,418** | **21,031** | **23,283** | **22,166** | **3,774** | **4,755** | **4,601** | **3,928** | **20,644** | **16,276** | **18,682** | **18,238** |
| KY,E | 1,644 | 1,722 | 1,962 | 1,404 | 754 | 903 | 1,052 | 605 | 890 | 819 | 910 | 799 |
| KY,W | 1,387 | 1,308 | 1,332 | 1,363 | 282 | 326 | 295 | 313 | 1,105 | 982 | 1,037 | 1,050 |
| MI,E | 5,041 | 5,853 | 5,195 | 5,699 | 704 | 1,372 | 1,222 | 854 | 4,337 | 4,481 | 3,973 | 4,845 |
| MI,W | 1,219 | 1,621 | 1,481 | 1,359 | 171 | 249 | 216 | 204 | 1,048 | 1,372 | 1,265 | 1,155 |
| OH,N | 7,988 | 4,061 | 6,895 | 5,154 | 462 | 661 | 636 | 487 | 7,526 | 3,400 | 6,259 | 4,667 |
| OH,S | 2,873 | 2,557 | 2,551 | 2,879 | 536 | 572 | 487 | 621 | 2,337 | 1,985 | 2,064 | 2,258 |
| TN,E | 1,492 | 1,156 | 1,274 | 1,374 | 285 | 211 | 230 | 266 | 1,207 | 945 | 1,044 | 1,108 |
| TN,M | 1,223 | 1,527 | 1,308 | 1,442 | 250 | 235 | 197 | 288 | 973 | 1,292 | 1,111 | 1,154 |
| TN,W | 1,551 | 1,226 | 1,285 | 1,492 | 330 | 226 | 266 | 290 | 1,221 | 1,000 | 1,019 | 1,202 |
| **7TH** | **14,746** | **15,876** | **16,207** | **14,415** | **2,022** | **2,184** | **2,344** | **1,862** | **12,724** | **13,692** | **13,863** | **12,553** |
| IL,N | 6,667 | 7,524 | 7,209 | 6,982 | 865 | 886 | 912 | 839 | 5,802 | 6,638 | 6,297 | 6,143 |
| IL,C | 969 | 988 | 1,013 | 944 | 172 | 187 | 199 | 160 | 797 | 801 | 814 | 784 |
| IL,S | 1,312 | 1,093 | 1,244 | 1,161 | 250 | 213 | 243 | 220 | 1,062 | 880 | 1,001 | 941 |
| IN,N | 1,649 | 1,742 | 1,905 | 1,486 | 191 | 246 | 249 | 188 | 1,458 | 1,496 | 1,656 | 1,298 |
| IN,S | 2,486 | 2,430 | 2,627 | 2,289 | 341 | 289 | 385 | 245 | 2,145 | 2,141 | 2,242 | 2,044 |
| WI,E | 1,417 | 1,302 | 1,460 | 1,259 | 148 | 186 | 186 | 148 | 1,269 | 1,116 | 1,274 | 1,111 |
| WI,W | 246 | 797 | 749 | 294 | 55 | 177 | 170 | 62 | 191 | 620 | 579 | 232 |
| **8TH** | **18,455** | **16,565** | **18,094** | **16,926** | **2,673** | **2,959** | **3,245** | **2,387** | **15,782** | **13,606** | **14,849** | **14,539** |
| AR,E | 3,997 | 2,525 | 1,876 | 4,646 | 465 | 399 | 508 | 356 | 3,532 | 2,126 | 1,368 | 4,290 |
| AR,W | 668 | 875 | 875 | 668 | 232 | 255 | 267 | 220 | 436 | 620 | 608 | 448 |
| IA,N | 572 | 559 | 628 | 503 | 237 | 231 | 250 | 218 | 335 | 328 | 378 | 285 |
| IA,S | 811 | 825 | 833 | 803 | 203 | 248 | 240 | 211 | 608 | 577 | 593 | 592 |
| MN | 6,845 | 5,724 | 7,257 | 5,312 | 294 | 396 | 400 | 290 | 6,551 | 5,328 | 6,857 | 5,022 |
| MO,E | 2,175 | 2,262 | 2,397 | 2,040 | 374 | 391 | 407 | 358 | 1,801 | 1,871 | 1,990 | 1,682 |
| MO,W | 1,841 | 2,172 | 2,390 | 1,623 | 540 | 626 | 751 | 415 | 1,301 | 1,546 | 1,639 | 1,208 |
| NE | 924 | 950 | 1,200 | 674 | 155 | 239 | 247 | 147 | 769 | 711 | 953 | 527 |
| ND | 242 | 221 | 238 | 225 | 75 | 71 | 80 | 66 | 167 | 150 | 158 | 159 |
| SD | 380 | 452 | 400 | 432 | 98 | 103 | 95 | 106 | 282 | 349 | 305 | 326 |

## Table C-1. (March 31, 2007—Continued)

| Circuit and District | Total Civil Cases | | | | U.S. Civil Cases | | | | Private Civil Cases | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pending Mar. 31, 2006 | Commenced | Terminated | Pending Mar. 31, 2007 | Pending Mar. 31, 2006 | Commenced | Terminated | Pending Mar. 31, 2007 | Pending Mar. 31, 2006 | Commenced | Terminated | Pending Mar. 31, 2007 |
| **9TH** | 41,313 | 41,105 | 40,867 | 41,551 | 7,735 | 9,063 | 8,820 | 7,978 | 33,578 | 32,042 | 32,047 | 33,573 |
| AK | 428 | 347 | 376 | 399 | 151 | 130 | 121 | 160 | 277 | 217 | 255 | 239 |
| AZ | 4,962 | 3,616 | 5,163 | 3,415 | 790 | 786 | 870 | 706 | 4,172 | 2,830 | 4,293 | 2,709 |
| CA,N | 6,679 | 7,680 | 6,265 | 8,094 | 713 | 1,124 | 970 | 867 | 5,966 | 6,556 | 5,295 | 7,227 |
| CA,E | 5,682 | 4,840 | 4,282 | 6,240 | 1,016 | 791 | 814 | 993 | 4,666 | 4,049 | 3,468 | 5,247 |
| CA,C | 10,700 | 11,590 | 11,455 | 10,835 | 2,410 | 2,976 | 3,018 | 2,368 | 8,290 | 8,614 | 8,437 | 8,467 |
| CA,S | 1,997 | 2,898 | 2,755 | 2,140 | 425 | 606 | 548 | 483 | 1,572 | 2,292 | 2,207 | 1,657 |
| HI | 772 | 690 | 708 | 754 | 132 | 96 | 94 | 134 | 640 | 594 | 614 | 620 |
| ID | 677 | 545 | 571 | 651 | 170 | 112 | 146 | 136 | 507 | 433 | 425 | 515 |
| MT | 875 | 640 | 757 | 758 | 242 | 219 | 232 | 229 | 633 | 421 | 525 | 529 |
| NV | 2,470 | 2,332 | 2,062 | 2,740 | 307 | 412 | 291 | 428 | 2,163 | 1,920 | 1,771 | 2,312 |
| OR | 2,383 | 2,452 | 2,427 | 2,408 | 736 | 749 | 779 | 706 | 1,647 | 1,703 | 1,648 | 1,702 |
| WA,E | 589 | 602 | 675 | 516 | 188 | 244 | 255 | 177 | 401 | 358 | 420 | 339 |
| WA,W | 3,001 | 2,782 | 3,303 | 2,480 | 431 | 791 | 661 | 561 | 2,570 | 1,991 | 2,642 | 1,919 |
| GUAM | 40 | 38 | 39 | 39 | 14 | 15 | 15 | 14 | 26 | 23 | 24 | 25 |
| NMI | 58 | 53 | 29 | 82 | 10 | 12 | 6 | 16 | 48 | 41 | 23 | 66 |
| **10TH** | 9,303 | 9,976 | 10,518 | 8,761 | 2,135 | 2,514 | 2,566 | 2,083 | 7,168 | 7,462 | 7,952 | 6,678 |
| CO | 2,160 | 2,746 | 2,865 | 2,041 | 339 | 615 | 519 | 435 | 1,821 | 2,131 | 2,346 | 1,606 |
| KS | 1,476 | 1,541 | 1,603 | 1,414 | 363 | 397 | 457 | 303 | 1,113 | 1,144 | 1,146 | 1,111 |
| NM | 1,375 | 1,431 | 1,366 | 1,440 | 338 | 424 | 427 | 335 | 1,037 | 1,007 | 939 | 1,105 |
| OK,N | 686 | 734 | 808 | 812 | 176 | 193 | 176 | 193 | 710 | 541 | 632 | 619 |
| OK,E | 503 | 547 | 590 | 460 | 219 | 176 | 191 | 204 | 284 | 371 | 399 | 256 |
| OK,W | 1,159 | 1,522 | 1,613 | 1,068 | 262 | 372 | 382 | 252 | 897 | 1,150 | 1,231 | 816 |
| UT | 1,380 | 1,165 | 1,329 | 1,216 | 331 | 260 | 340 | 251 | 1,049 | 905 | 989 | 965 |
| WY | 364 | 290 | 344 | 310 | 107 | 77 | 74 | 110 | 257 | 213 | 270 | 200 |
| **11TH** | 21,731 | 35,128 | 27,297 | 29,562 | 4,947 | 4,747 | 5,182 | 4,512 | 16,784 | 30,381 | 22,115 | 25,050 |
| AL,N | 2,577 | 4,984 | 3,678 | 3,883 | 566 | 569 | 608 | 527 | 2,011 | 4,415 | 3,070 | 3,356 |
| AL,M | 1,259 | 1,180 | 1,296 | 1,143 | 232 | 173 | 247 | 158 | 1,027 | 1,007 | 1,049 | 985 |
| AL,S | 705 | 939 | 828 | 816 | 167 | 155 | 168 | 154 | 538 | 784 | 660 | 662 |
| FL,N | 1,262 | 1,647 | 1,583 | 1,326 | 346 | 349 | 345 | 350 | 916 | 1,298 | 1,238 | 976 |
| FL,M | 5,224 | 13,489 | 6,429 | 12,284 | 1,140 | 1,320 | 1,279 | 1,181 | 4,084 | 12,169 | 5,150 | 11,103 |
| FL,S | 5,710 | 7,062 | 7,277 | 5,495 | 1,650 | 1,266 | 1,494 | 1,412 | 4,060 | 5,806 | 5,783 | 4,083 |
| GA,N | 3,050 | 3,614 | 4,009 | 2,655 | 493 | 583 | 661 | 415 | 2,557 | 3,031 | 3,348 | 2,240 |
| GA,M | 1,057 | 1,131 | 1,089 | 1,099 | 225 | 195 | 227 | 193 | 832 | 936 | 862 | 906 |
| GA,S | 887 | 1,082 | 1,108 | 861 | 128 | 147 | 153 | 122 | 759 | 935 | 955 | 739 |

## Table C-1.
## U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Period Ending March 31, 2007

| Circuit and District | Total Civil Cases | | | | U.S. Civil Cases | | | | Private Civil Cases | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pending Mar. 31, 2006 | Commenced | Terminated | Pending Mar. 31, 2007 | Pending Mar. 31, 2006 | Commenced | Terminated | Pending Mar. 31, 2007 | Pending Mar. 31, 2006 | Commenced | Terminated | Pending Mar. 31, 2007 |
| **TOTAL** | 245,930 | 278,272 | 254,850 | 269,352 | 41,413 | 44,164 | 45,974 | 39,603 | 204,517 | 234,108 | 208,876 | 229,749 |
| DC | 3,275 | 2,388 | 2,757 | 2,906 | 1,889 | 1,280 | 1,604 | 1,565 | 1,386 | 1,108 | 1,153 | 1,341 |
| **1ST** | 7,087 | 5,739 | 5,958 | 6,868 | 1,305 | 1,376 | 1,353 | 1,328 | 5,782 | 4,363 | 4,605 | 5,540 |
| ME | 293 | 396 | 398 | 291 | 85 | 110 | 113 | 82 | 208 | 286 | 285 | 209 |
| MA | 3,869 | 3,064 | 3,230 | 3,693 | 653 | 723 | 687 | 689 | 3,206 | 2,341 | 2,543 | 3,004 |
| NH | 410 | 475 | 487 | 398 | 70 | 104 | 98 | 76 | 340 | 371 | 389 | 322 |
| RI | 813 | 538 | 588 | 763 | 140 | 95 | 124 | 111 | 673 | 443 | 464 | 652 |
| PR | 1,712 | 1,266 | 1,255 | 1,723 | 357 | 344 | 331 | 370 | 1,355 | 922 | 924 | 1,353 |
| **2ND** | 32,103 | 27,879 | 21,999 | 37,983 | 3,998 | 3,103 | 3,367 | 3,734 | 28,105 | 24,776 | 18,632 | 34,249 |
| CT | 2,739 | 2,168 | 2,398 | 2,509 | 340 | 311 | 363 | 288 | 2,399 | 1,857 | 2,035 | 2,221 |
| NY,N | 2,715 | 1,532 | 1,574 | 2,673 | 597 | 335 | 328 | 604 | 2,118 | 1,197 | 1,246 | 2,069 |
| NY,E | 7,447 | 6,899 | 5,796 | 8,550 | 1,177 | 981 | 1,032 | 1,126 | 6,270 | 5,918 | 4,764 | 7,424 |
| NY,S | 16,171 | 15,476 | 10,235 | 21,412 | 1,179 | 974 | 995 | 1,158 | 14,992 | 14,502 | 9,240 | 20,254 |
| NY,W | 2,698 | 1,517 | 1,690 | 2,525 | 626 | 425 | 558 | 493 | 2,072 | 1,092 | 1,132 | 2,032 |
| VT | 333 | 287 | 306 | 314 | 79 | 77 | 91 | 65 | 254 | 210 | 215 | 249 |
| **3RD** | 22,439 | 49,423 | 40,194 | 31,668 | 2,819 | 3,286 | 3,468 | 2,637 | 19,620 | 46,137 | 36,726 | 29,031 |
| DE | 1,410 | 862 | 932 | 1,340 | 161 | 81 | 89 | 153 | 1,249 | 781 | 843 | 1,187 |
| NJ | 5,818 | 6,582 | 6,609 | 5,791 | 885 | 994 | 1,077 | 802 | 4,933 | 5,588 | 5,532 | 4,989 |
| PA,E | 9,602 | 36,661 | 27,135 | 19,128 | 595 | 840 | 873 | 562 | 9,007 | 35,821 | 26,262 | 18,566 |
| PA,M | 2,035 | 2,526 | 2,535 | 2,026 | 446 | 785 | 749 | 482 | 1,589 | 1,741 | 1,786 | 1,544 |
| PA,W | 2,418 | 2,383 | 2,675 | 2,126 | 524 | 477 | 619 | 382 | 1,894 | 1,906 | 2,056 | 1,744 |
| VI | 1,156 | 409 | 308 | 1,257 | 208 | 109 | 61 | 256 | 948 | 300 | 247 | 1,001 |
| **4TH** | 14,363 | 16,996 | 17,825 | 13,534 | 3,669 | 3,990 | 4,193 | 3,466 | 10,694 | 13,006 | 13,632 | 10,068 |
| MD | 2,944 | 3,508 | 3,528 | 2,924 | 645 | 826 | 856 | 615 | 2,299 | 2,682 | 2,672 | 2,309 |
| NC,E | 1,373 | 1,283 | 1,449 | 1,207 | 519 | 514 | 557 | 476 | 854 | 769 | 892 | 731 |
| NC,M | 1,011 | 1,073 | 1,106 | 978 | 324 | 281 | 303 | 302 | 687 | 792 | 803 | 676 |
| NC,W | 1,053 | 1,051 | 1,169 | 935 | 212 | 216 | 225 | 203 | 841 | 835 | 944 | 732 |
| SC | 3,183 | 3,656 | 3,866 | 2,973 | 692 | 642 | 757 | 577 | 2,491 | 3,014 | 3,109 | 2,396 |
| VA,E | 2,012 | 3,485 | 3,564 | 1,933 | 291 | 558 | 537 | 312 | 1,721 | 2,927 | 3,027 | 1,621 |
| VA,W | 791 | 1,235 | 1,268 | 758 | 250 | 468 | 416 | 302 | 541 | 767 | 852 | 456 |
| WV,N | 719 | 621 | 591 | 749 | 305 | 213 | 203 | 315 | 414 | 408 | 388 | 434 |
| WV,S | 1,277 | 1,084 | 1,284 | 1,077 | 431 | 272 | 339 | 364 | 846 | 812 | 945 | 713 |